# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO.    C-240723
                                          TRIAL NO.     B-2402641
    Plaintiff-Appellee,        :

  vs.                              :

CLARENCE HIGGINS,                 :        *JUDGMENT ENTRY*

    Defendant-Appellant.       :


     This cause was heard upon the appeal, the record, and the briefs.

     For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

     Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

     The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 11/12/2025 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *State v. Higgins*, 2025-Ohio-5118.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240723 |
| | | TRIAL NO. | B-2402641 |
| Plaintiff-Appellee, | : | | |
| vs. | : | *O P I N I O N* | |
| CLARENCE HIGGINS, | : | | |
| Defendant-Appellant. | : | | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 12, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Kessler Defense LLC* and *Stephanie F. Kessler*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1}   Clarence Higgins appeals his convictions for two counts of felonious assault.  In his sole assignment of error, Higgins contends his convictions were against the weight of the evidence.  For the following reasons, we affirm the judgment of the trial court.

## Factual Background

{¶2}   On June 12, 2024, Higgins was indicted for two counts of felonious assault, with gun specifications, one count of having weapons while under a disability, one count of carrying a concealed weapon ("CCW"), and one count of improperly handling firearms in a motor vehicle.  Higgins proceeded to a bench trial.

{¶3}   T.C. testified that Higgins was her former boyfriend of eight years.  They ended the relationship in the summer of 2018.  On May 19, 2024, T.C., who worked as a drive-through cashier at Captain D's, finished working in the afternoon.  When she exited from the building, T.C. saw Higgins in his car in the parking lot.  Higgins sped around the lot startling her and "blabbering off at the mouth."  Higgins was "hanging out" of the window with a gun in his hand.

{¶4}   T.C. had not communicated with Higgins via the telephone since she changed her phone number in 2018.  After 2018, T.C.'s first encounter with Higgins was in October of 2023, when Higgins had driven to her apartment and confronted her in the parking lot.  Higgins had previously driven through the Captain's D's drive-through, uninvited and unannounced.  The previous week, Higgins stopped at the drive-through and proclaimed his love for her and told her that he was going to shoot her fiancé.  That day, she had not spoken with him or invited him to the restaurant.

{¶5}   T.C.'s fiancé T.W. was waiting to pick her up and had parked in front of the door to the restaurant.  T.C. entered his vehicle, and they left the parking lot and

drove down Reading Road. Higgins followed them when they left the parking lot, "waving and flagging his gun the whole time." Higgins was excessively talking, saying, "I'm going to get you. I'm going to get you all, I'm going to get you all." T.C. testified that they briefly lost Higgins when they abruptly turned onto Tennessee Avenue, but he reappeared when they parked on Tennessee.

{¶6} After T.C. opened the passenger door to exit from the vehicle, she saw Higgins coming from behind hanging out the window pointing his gun toward T.W.'s vehicle. Higgins stopped his car on the passenger side of T.W.'s car. When T.C. heard the first shot, she jumped out of the car and ran across the street. T.C. heard three shots as she was running and a few more after she had crossed the street. T.C. testified that the first shot came from Higgins's car.

{¶7} After the first round of shots, Higgins continued to drive and struck a parked vehicle. Higgins continued down the street, made a U-turn, and came back toward T.W.'s car. As Higgins drove past T.W.'s car, T.C. heard more gunshots. On cross-examination, T.C. repeatedly denied calling Higgins that day or inviting him to visit her at work.

{¶8} T.W. testified that he first encountered Higgins when he was picking up T.C. from work. After T.C. got into his car, Higgins pulled up on his driver's side while flashing a gun and said, "I'm going to get you. I'm going to get you." T.W. drove onto Reading Road, and Higgins followed him flashing the gun and saying, "I'm going to get you." T.W. was traveling about 45-50 m.p.h. and running red lights. Originally, they had planned to go to their home, but when Higgins began to chase them, T.W. decided to drive to his mother's home because it was closer and he knew people would be outside. His mother was having a yard sale that day.

{¶9} When T.W. parked on his mother's street, Higgins pulled up on the

4

passenger side of his vehicle. Immediately, T.W. heard shots and saw Higgins with a black, semi-automatic gun in his hand. T.W. opened his door, pulled his gun from his holster, and fired five shots. Higgins returned fire and continued driving. Higgins hit another car and continued driving. Instead of leaving, Higgins made a U-turn, drove toward him, fired more shots, and drove away. By then, T.W. had taken shelter behind the apartment building. T.W. placed his gun on the grass and waited for the police to arrive. When the officers arrived, T.W. immediately informed the officers that he had fired his weapon and produced his concealed-carry license.

{¶10} P.S., T.W.'s mother, testified that she was having a yard sale that day. After T.W.'s car arrived, P.S. saw another car pull up on T.W.'s passenger side. The driver was talking and had a gun in his hand pointed at T.W.'s car. When P.S. saw his gun, she yelled, "Gun, get out of the car," and immediately heard shots. The driver went down the street, hit a car, turned around, came back, and fired more shots. The driver's arm was horizontal, pointing toward the building while he was shooting. When she saw the car return, P.S. ran into the building and called the police.

{¶11} The investigating detective from the Cincinnati Police Department testified that he responded to the scene after receiving multiple calls of shots fired. One of the callers reported that a man wearing red shoes returned fire at the vehicle firing the shots. When the detective arrived, he spoke with T.W. who was wearing red shoes. T.W. was standing in the front yard and was fully cooperative. T.W. explained that he was being followed by a vehicle when that driver started shooting at him. T.W. returned fire with his 9 mm pistol. T.W.'s vehicle had two bullet holes, one on the back passenger side and one on the front passenger side next to the mirror. The detective recovered five 9 mm shell casings on the driver's side of the vehicle and two 40-caliber casings on the passenger's side of the vehicle. The investigator testified that when a

gun is fired from a vehicle, the casings often remain on the top of the car, fall from the windshield in between the wipers or on the street, or remain in the car.

{¶12} The State rested, and Higgins testified on his own behalf. Higgins testified that T.C. called him earlier that day, and they had planned on meeting at Captain D's when her shift ended. Higgins testified that he had been "seeing her off and on at work," and that the two had been texting and calling each other. Higgins testified that T.C. had called him earlier that day and asked him to meet her at Captain D's.

{¶13} When Higgins pulled into the parking lot, he saw T.C. exit from the building and pulled up next to her. Higgins told T.C. that she had asked him to meet her, and she looked at him "kind of crazy." The two had a disagreement, and T.C. continued walking. The man she was with asked Higgins what he wanted with T.C. The two exchanged words, and Higgins pulled up next to him when he parked on Tennessee. When Higgins looked up, T.C. left the vehicle, and T.W. fired a shot at him.

{¶14} Higgins admitted that he had a gun, but testified that he was not holding the gun while driving or waving it out the window. After T.W. fired at him, Higgins drove into a parking area to see if he had been hit by the gunshot. Higgins turned around and as he approached T.W.'s car, two more shots hit his car. At that point, Higgins fired two shots in the air, and drove away.

{¶15} Three photographs were admitted into evidence, and Higgins testified that one photo depicted the bullet damage on his driver's side when he initially pulled up on the passenger side of the vehicle. The next photo showed "two ricocheted bullet shots" on his hood, and the third photo showed a bullet hole in his windshield. When Higgins was arrested a few weeks later, he immediately told the officer that he had been shot at a few weeks earlier. He also told the police that he carried a gun because

6

the shooting a few weeks earlier left him scared for his life.

{¶16} On cross-examination, Higgins testified that he had been speaking to T.C. at least every other day, and sometimes they spoke daily through text messages and phone calls. When asked if he had provided his cell phone records to his attorney, Higgins responded, "No, I didn't give them to my attorney. I ain't got my phone." Higgins further explained that when he ran from the police, he dropped his phone. One of the officers retrieved his phone, but never returned it to him. Higgins did not ask his attorney to request his cell phone records.

{¶17} That day, Higgins was coming to get something from T.C. T.C. had asked Higgins to meet her 20 or 30 minutes before her shift ended, but he was late. By the time he arrived, T.C. was entering another vehicle. T.C. never told him that she had a fiancé. Higgins testified that his gun was in his glove box.

{¶18} Higgins further testified that as he was arguing with T.C, T.W. interrupted them. When both cars left the parking lot, they drove next to each other. Higgins wanted to know why T.C. asked him to meet her, so his plan was to continue following them to retrieve "whatever she told me to come and get." Higgins drove to Tennessee because he "was still going down the road disagreeing with her." During the drive, sometimes his car was in front, and sometimes T.W.'s car was in front. Higgins testified that his gun remained in the glove box during the drive.

{¶19} When Higgins pulled up next to them on Tennessee, he was on the passenger side of T.W.'s car. T.C. had exited from the car and walked to the rear of the car. T.W. was standing outside of the car between the driver's-side door and the inside of the car. When Higgins looked at T.W., "a gunshot came." Higgins immediately drove off to see if he was hit. When he saw that his car had been hit, he retrieved his gun. Higgins did not fire until he turned and approached the car. As he approached,

two bullets hit his car, so he fired three or four shots into the air.

{¶20} The trial court found Higgins guilty on the two felonious-assault charges with gun specifications and the improper-handling charge. The court acquitted him of the CCW charge. The court first noted that it believed the testimony of T.C., T.W., and P.S. Based on their testimony, the court found that Higgins brandished and showed a firearm at Captain D's, followed them, threatened them, and brandished the gun while driving. After T.W. stopped on Tennessee, Higgins fired his weapon at them. Higgins fired the first shot before T.C. and T.W. exited from the vehicle. After they exited from the vehicle, Higgins fired more shots.

{¶21} The court believed T.C.'s testimony that Higgins brandished the gun at Captain D's and when he pulled up next to T.W.'s car as she was attempting to exit from the car. T.W.'s testimony confirmed the threats. The court found T.W.'s testimony to be credible and believed that T.W. did not fire his gun until Higgins fired at them. The court could not determine who fired first after Higgins turned around and drove toward T.W.'s car, and the court clarified that the convictions were based on the first shots fired and not on the shots fired after Higgins turned around and drove past them. The court was also persuaded by P.S.'s testimony that she saw Higgins fire at T.W.'s car and saw Higgins with his gun hanging out of the window.

{¶22} The court found Higgins's explanation of the event to be confusing and explained that it did not consider Higgins's testimony about the events at Captain D's. The court believed Higgins's testimony that he had a gun and shot at them.

{¶23} Higgins now appeals arguing that the felonious-assault convictions were contrary to the manifest weight of the evidence.

## Manifest Weight

{¶24} In reviewing a challenge to the weight of the evidence, we sit as a

8

"thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

{¶25} Higgins argues that the convictions were contrary to the weight of the evidence because the trial court concluded that Higgins lacked credibility based on its misunderstanding of his testimony.

{¶26} In its factual findings, the trial court mistakenly believed that Higgins testified that the first shot occurred at Captain D's. Signficantly, the court acknowledged that it may not have understood his testimony correctly, and specified that it did not consider the testimony because it made no sense. Thus any error the court made was harmless because it did not affect the guilty verdict.

{¶27} Higgins further challenges the credibility of T.W.'s testimony that he did not return fire when Higgins fired at him after he turned his car around. However, the trial court explicitly stated that the guilty findings were based solely on the initial shots fired and not the shots fired after Higgins turned around.

{¶28} Higgins claims that P.S. testified that she saw Higgins fire two shots into the air, corroborating his testimony. Higgins misstates P.S.'s testimony. When asked

if Higgins was shooting up in the air, P.S. responded that he had "his hand out like this" and demonstrated how Higgins had held the gun. P.S. confirmed that she saw Higgins shooting with "his hand out the window horizontal to the people." P.S. denied that Higgins fired shots into the air.

{¶29} These alleged errors with respect to the trial court's factual findings would be harmless because the trial court made it clear that the guilty verdicts were based on the initial shots fired. The court did not make any factual findings with respect to the shots fired after Higgins turned around.

{¶30} Here, the trial court believed the testimony of T.C., T.W., and P.S. that Higgins fired the initial shots. "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *State v. Glover*, 2019-Ohio-5211, ¶ 30 (1st Dist.), quoting *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20. A "conviction [i]s not against the manifest weight of the evidence merely because the [factfinder] chose to believe the state's witnesses over the defense's witnesses." *State v. Jackson*, 2024-Ohio-2728, ¶ 16 (1st Dist.), citing *State v. Robinson*, 2019-Ohio-3144, ¶ 16 (12th Dist.). This is not one of those exceptional cases in which the evidence weighs heavily against the convictions, and we cannot say that that the trial court clearly lost its way and created a manifest miscarriage of justice.

{¶31} Accordingly, we overrule the assignment of error.

## Conclusion

{¶32} Having overruled Higgins's sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

CROUSE and MOORE, JJ., concur.